IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| UNITED HERITAGE LIFE INSURANCE COMPANY, *et al.*, | ) ) ) ) ) |
| Plaintiffs, | ) Case No. CV 06-0496-S-MHW ) |
| v. | ) ) |
| FIRST MATRIX INVESTMENT SERVICES CORPORATION, a Texas corporation; UNITED WESTERN BANCORP, f/k/a Matrix Bancorp, Inc., a Colorado corporation; and DUNCAN-WILLIAMS, INC., a Tennessee corporation, *et al.*, | ) **MEMORANDUM DECISION** ) **AND ORDER** ) ) ) ) ) ) |
| Defendants. | ) ) |

Currently pending before the Court is Defendant Duncan-Williams' Motion to Dismiss (Docket No. 88). Based on the following analysis, the motion will be granted.

**I.
Procedural Background**

Plaintiffs United Heritage Financial Group, Inc. and United Heritage Life Insurance Co. (collectively, "United Heritage") originally filed this action for damages and rescission in the Fourth Judicial District of the State of Idaho on October 27, 2006. Named as Defendants were First Matrix Investment Services Corp., United Western Bancorp (collectively, "First Matrix"), Duncan-Williams, Inc., Duncan F. Williams, and Carolyn Williams (collectively, "Duncan-

Williams"). Also named were Brian Curd, Chief Executive Officer of First Matrix, Kent Snodgrass, Senior Vice President of First Matrix, Scot T. Wetzel, President and Chief Executive Officer of United Western Bancorp and Michael J. McCloskey, Chief Operating Officer of United Western Bancorp. The complaint alleged four causes of action: (1) violation of the Idaho Uniform Securities Act ("IUSA"); (2) violation of the Idaho Consumer Protection Act; (3) negligent misrepresentation; and (4) fraud. During the briefing on a Motion to Dismiss (Docket No. 13) filed by Duncan-Williams on January 16, 2007 and a Motion to Amend Complaint (Docket No. 16) filed by United Heritage on February 1, 2007, Plaintiffs agreed to withdraw their claim under the IUSA and the negligent misrepresentation claim. Instead, they sought to assert new claims under the Tennessee Security Act and Colorado Securities Act. At the hearing on these motions, Plaintiff agreed to voluntarily dismiss without prejudice Brian Curd and Kent Snodgrass because they had not been properly served. Defendants Scot T. Wetzel and Michael J. McCloskey were dismissed with prejudice.

On June 20, 2007, the Court issued a Memorandum Decision and Order (Docket No. 43) dismissing the Duncan-Williams Defendants for lack of personal jurisdiction and allowing United Heritage to bring claims under the Colorado Securities Act. The Court allowed that if additional facts came forward during the course of discovery, United Heritage could amend its complaint and bring the Duncan-Williams Defendants back in as a party. On May 14, 2008, United Heritage filed a motion seeking to amend the complaint to add Duncan-Williams back into the case as Defendants. The Court granted this motion on July 15, 2008.

Now pending before the Court is the Duncan-Williams Defendants' Motion to Dismiss. On January 28, 2009, the Court granted Duncan-Williams' motion to have an evidentiary hearing

**Memorandum Decision and Order - Page 2**

on the matter. This hearing was held on April 29, 2009. The scope of the evidentiary hearing was limited to whether an alleged telephone call took place in July 2003.

## II.
## DISCUSSION

### A. The Parties and their Relationship

United Heritage is a qualified institutional buyer and has owned or invested over $350 million in eligible securities. Jack Winderl ("Winderl") is United Heritage's Chief Investment Officer and oversees and approves all of United Heritage's bond investments. Winderl conducts his business out of an United Heritage office located in Meridian, Idaho. He testified that he uses three computer monitors, relies on Bloomberg messages, often has 20-25 phone calls a day from individual brokers or groups wanting him to purchase investments, along with many e-mails. He does 75% of his transactions through 3 or 4 brokers, but has daily contact from many others, such as First Matrix, who are also offering securities for sale. He testified that most of his telephone conversations are very short and because of the daily business pressures, there is little time for chit-chat.

The other key participants in this dispute, Duncan-Williams and First Matrix, are located in Memphis, Tennessee. In fact, their offices are in the same office building, but on different floors. Some of the Duncan-Williams witnesses testified that they did not know that First Matrix was actually in their same building until after this transaction in question had occurred. Duncan-Williams offers a number of different services, including institutional sales and trading, financial services, representation of individual investors, underwriting bonds, and offering, selling and advising others as to the value of securities.

In late 2002 to early 2003, Duncan-Williams started putting together transactions

**Memorandum Decision and Order - Page 3**

involving a relatively new product on the market.  These were bonds issued under the United States Department of Agriculture Section 538 Guaranteed Rural Rental Housing Program, ("538 Program").  The purpose of these bonds was to promote construction of moderate to low income housing in rural areas.  The Public Finance Department of Duncan-Williams handled these bonds.  Two Senior Vice Presidents working out of this department were Adis O. "Buddy" Crifield and Wayne Breunig.  Once they had purchased or underwrote a bond offering on behalf of Duncan-Williams, they would turn it over to a sales manager at Duncan-Williams who would assign the offering to Duncan-Williams registered securities salesmen, who would resell the bonds for a commission.

Two of the registered securities sales agents were Gerald T. Lusk ("Lusk") and William M. "Michael" Jordan ("Jordan").  These two had worked together at Duncan-Williams for approximately sixteen years and often partnered on sales where they would share the commission, but generally handled their own accounts.   Before the transaction in question, both of these sales agents had marketed several prior offerings of bonds under the 538 Program.

One of the investment services that Lusk and Jordan would contact when they had products to sell was First Matrix.  One of the registered securities sales agents  working in the Memphis office, Joel Banes ("Banes"), was well known to them since he had previously worked at Duncan-Williams for a number of years.  They also knew that he had experience in dealing with SBA government backed loans, which had some characteristics similar to the 538 Program.  When First Matrix purchased bonds, it could either hold them for its own account, or sales agents could sell them to other investors for a commission.

Those working in the business of purchasing and selling securities recognize that it is a

**Memorandum Decision and Order - Page 4**

highly competitive business. It takes years to develop a client base and sales agents guard the identity of their clients jealously during a transaction so that another agent does not take the client or the salesman is cut out of transaction if the client decides to go directly to a seller and avoid the commission.

**B.     The 2003 Cameron at Clarkesville Bond Transaction**

United Heritage alleges that it was induced into purchasing bonds from First Matrix, in part due to the representations made to Winderl by representatives from Duncan-Williams during a July 2003 telephone conference call that had been arranged by First Matrix. The investment bonds were issued to finance the development and construction of the Cameron at Clarkesville Project, a 60-unit low-income apartment complex in Clarkesville, Georgia. The bonds were issued under the 538 Program and during this alleged telephone conference between Winderl, (representing United Heritage), Banes (representing First Matrix), and Crihfield and Breunig (representing Duncan-Williams); United Heritage alleges that Crihfield and Breunig helped close the sale of the bonds to United Heritage by their representations made to Winderl. The question before the Court on this motion to dismiss is a narrow one, did Duncan-Williams purposely avail themselves of the opportunity to do business in Idaho during this phone call, as to allow the exercise of personal jurisdiction over Duncan-Williams? Of course this turns on whether the phone call ever occurred, a fact Duncan-Williams hotly disputes.

Based on the testimony and exhibits, the Court now makes the following factual findings regarding the events leading up to the disputed telephone conversation, and where appropriate, its reasoning.

Duncan-Williams was the sole underwriter for the Clarkesville Bonds and Wayne

**Memorandum Decision and Order - Page 5**

Breunig and Buddy Crihfield oversaw the structure and dissemination of the documentation for these bonds.  This included a Preliminary Summary Sheet on Duncan-Williams' letterhead which described the USDA Guarantee as follows, ". . . will guarantee 90% of losses realized in the event of default under the Mortgage Note."   (Pl.'s Exhibit 22.)  This offering was assigned to Lusk and Jordan and other Duncan-Williams sales agents, and they eventually sold the bonds to three qualified institutional investors, one of which was First Matrix, through its office in Memphis, Tennessee with a trade date of July 31, 2003 and a settlement date of August 19, 2003.  In making his sale, Lusk dealt with Banes at First Matrix and the bonds were transferred directly to First Matrix.

The Court heard testimony from Buddy Crihfield, Wayne Breunig, Michael Jordan, Tommy Lusk, Joel Banes and Jack Winderl.  Joel Banes and Jack Winderl both testified that they were on a conference call together with Wayne Breunig and Buddy Crihfield sometime during the last week of July 2003.  Crihfield and Breunig both deny being involved in this telephone call, as do Tommy Lusk and Michael Jordan.

Banes testified that sometime during July 2003, he was approached by either Lusk or Jordan about selling the Clarkesville Bonds since he was familiar with government-guaranteed bonds.  He showed the bonds to several customers and Jack Winderl of United Heritage, whom Banes had never done business with before, expressed interest in the bonds and asked for written description of the offering.  Banes told him he would send a Preliminary Summary Sheet of the transaction.  On July 21, 2003 Banes faxed Winderl the same summary sheet he had gotten from Lusk, but only after carefully removing the Duncan-Williams' letterhead and affixing the letterhead of First Matrix.  (Pl.'s Exhibit 14.)  Banes testified that he did this because he did not

**Memorandum Decision and Order - Page 6**

want United Heritage to know who the underwriter was since there was always a danger he could be cut out of the transaction.

After receiving the Preliminary Summary Sheet, Winderl testified that he had questions that Banes was uncomfortable with answering. Banes testified that he felt Lusk and Jordan did not know enough about the bonds either, so he got in touch with Crihfield and Breunig who, through talking with Lusk, he believed had the most knowledge about the bonds. Banes further testified that Crihfield and Breunig came to his office, he placed the telephone call to Winderl, gave a brief first-name introduction of everyone and that Winderl engaged in a question and answer session with Crihfield and Breunig about the bonds. All the parties testified that the call did not last long.

Of key importance to United Heritage's position, Winderl testified that when he made his introduction over the phone, he provided several details to Crihfield and Breunig about United Heritage. He testified that he introduced himself by his full name and that he was with United Heritage, which was located near Boise, Idaho. He also testified that he told them the nature of United Heritage's business and that it generally looked at conservative investments. Also, since he understood from Banes and the Preliminary Summary Sheet that he had received from Banes that the bonds were 90% guaranteed by the USDA, he was most interested in how the 10%, that was not covered by the USDA, would be covered in the event of default.

This testimony conflicts to some degree with the testimony of Banes. When asked whether Winderl provided more information on who he was, what type of business United Heritage was and where he was located, Banes testified that Winderl could have provided this information but he did not have a specific recollection either way. However, the Court believes

**Memorandum Decision and Order - Page 7**

that if Winderl had gone on to provide all of these details, Banes clearly would have remembered. Banes had already taken steps to ensure that Winderl did not know the identity of Duncan-Williams since he removed its name from the letterhead and inserted the name of First Matrix. He testified that he referred to Winderl as "my guy" and used first names only. It seems that if Winderl suddenly started providing Duncan-Williams with details of his company and where it was located, this would have had stuck in Banes' mind. Also, Banes testified that Crihfield and Breunig bought several large binders to the conference call which explained the Clarkesville Bonds transaction. As will be discussed later, the Court finds that it is likely Banes is recalling a later telephone call that the parties participated in involving another transaction.

Crihfield and Breunig both testified unequivocally that they were not on the phone call with Banes and Winderl regarding the Clarkesville Bonds in July 2003. They also stated it would have been highly unlikely that Lusk and Jordan would have put them in contact with Banes on this transaction because there was an unwritten rule for them not to contact a sales agent's clients. Crihfield and Breunig do admit to being on a telephone call with Banes and United Heritage regarding the Red Bluffs transaction in late 2003. Breunig testified that it was practically a necessity for him to know the identity of the customer in Red Bluffs because it involved a loan, not a security like Clarkesville, and a lot of paperwork needed to be completed before it could close. Also they bought several large binders to that conference call which documented the transaction. In contrast, since the Clarkesville Bonds were under the 538 Program, there was little in the way of underlying documentation. Interestingly, there is documentation of e-mails between United Heritage, First Matrix and Duncan-Williams on the Red Bluffs transaction but no similar documentation for the Clarkesville transaction.

**Memorandum Decision and Order - Page 8**

Likewise, Jordan and Lusk also testified they were not involved in this telephone call. Lusk testified that he had researched the 538 bonds very thoroughly and there would have been no need to get Crihfield and Breunig involved in the transaction because he would have been able to answer all of Banes' questions. Additionally, Breunig and Crihfield would have never contacted his customer without asking him first and they never asked permission to talk to his clients on the Clarkesville transaction.

Also addressed at the hearing was the event of Hurricane Elvis that hit Memphis on July 22, 2003, the week the telephone call is alleged to have taken place. Duncan-Williams' office was open the week the hurricane hit and Crihfield, Breunig, Jordan and Lusk testified that while business was still conducted, the circumstances were unusual and many people were out of the office. Additionally, Crihfield, a volunteer sheriff and medical first responder, assisted with the clean-up following the hurricane that week and was often out of the office.

The Court finds the testimony of Lusk, Jordan, Crihfield and Breunig to be more credible than that of Banes and Winderl and finds that United Heritage has not met its burden in proving by a preponderance of the evidence that Crihfield and Breunig were involved in the July 2003 telephone call. In making this determination, sufficient weight is given to Lusk's testimony that he had thoroughly researched the 538 bonds, had been involved in several prior 538 Program offerings which he sold to his parents and other family members. Also both Lusk and Jordan were briefed at various sales meetings about the 538 Program, had met with large institutional investors where the program was discussed and were familiar with the opinion letter from bond counsel for Duncan-Williams which explained various aspects of the program in detail. (Def.'s Exhibit 105.) As Lusk testified, there would be no need to get Crihfield and Breunig involved in

**Memorandum Decision and Order - Page 9**

the transaction and even with Hurricane Elvis, he was in cell contact with his office and never received any calls from Banes asking him questions about Clarkesville. The Court also finds as less than credible Winderl's testimony that he would have provided a detailed introduction of himself, including his last name, place of employment and his location on the alleged telephone call with Banes, Crihfield and Breunig. As an experienced trader in securities, Winderl would have known that Banes would want him to keep his identity confidential until the sale had closed, even though Winderl testified that he would never go around someone like Banes to save a commission.

Finally, the Court has placed some weight on the first demand letters sent by United Heritage after the Clarkesville project got into financial trouble. These letters were sent on June 27, 2006 and on August 14, 2006 by house counsel for United Heritage, Geoff Baker, to First Matrix. (Def.'s Exhibits 103, 104.) Both of these letters referred to the oral representations of Banes on behalf of First Matrix about the guaranteed nature of the Clarkesville Bonds. Absent from both of these letters is any reference at all to any oral representation from Duncan-Williams, as the underwriter of the bonds. If United Heritage believed that it had been misled about the nature of the bonds during the alleged July 2003 telephone call, the Court finds it very odd that no demand was made on Duncan-Williams, as it was on First Matrix.

### C.     Rule 12(b)(2) Motion to Dismiss

Personal jurisdiction over both parties is required before a court may decide a case in controversy. U.S. CONST. AMEND. XIV. As there is not a federal statute governing personal jurisdiction in this case, Idaho law applies. *See Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004). In order for an Idaho court to exert jurisdiction over an out-of-

state defendant, the Supreme Court of Idaho has imposed a two-part test. *Smalley v. Kaiser*, 130 Idaho 909, 912, 950 P.2d 1248, 1251 (1997). First, the act giving rise to the cause of action must fall within Idaho's long-arm statute and second, the constitutional standards of due process must be met. *Id*.

Idaho's long-arm statute grants jurisdiction to Idaho courts over causes of action which arise from, among other things: "[t]he transaction of any business within this state which is hereby defined as the doing of any act for the purpose of realizing pecuniary benefit or accomplishing or attempting to accomplish, transact or enhance the business purpose or objective...;" and "[t]he commission of a tortious act within this state." IDAHO CODE § 5-514(a), (b). In adopting § 5-514, the Idaho Legislature intended to exercise all the jurisdiction available to the State of Idaho under the due process clause of the United States Constitution. *Houghland Farms, Inc. v. Johnson*, 119 Idaho 72, 75, 803 P.2d 978, 981 (1990). Thus, the inquiry is the same under both Idaho's long-arm statute and the federal due process clause and the Court need only decide whether asserting personal jurisdiction complies with due process. *Lake v. Lake*, 817 F.2d 1416, 1420 (9th Cir. 1987). *See also DBSI Signature Place, LLC v. BL Greensboro, L.P.*, 392 F. Supp. 2d 1206, 1211 (D. Idaho 2005).

There are two types of personal jurisdiction - general and specific. *Lake v. Lake*, 817 F.2d 1416, 1420 (9th Cir. 1987). General jurisdiction is exercised by a state when personal jurisdiction is asserted over a "defendant in a suit not arising out of or related to the defendant's contacts with the forum." *Helicoptores Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 n. 9 (1984). This occurs when the defendant has "substantial" or "continuous and systematic" contacts with the state to the extent that these contacts approximate physical presence. *Bancroft*

**Memorandum Decision and Order - Page 11**

*& Masters, Inc. v. Augusta Nat. Inc.*, 223 F.3d 1082 (9th Cir. 2000). United Heritage does not seek to invoke general jurisdiction in this case.

Specific jurisdiction is exercised by a state when it asserts personal jurisdiction over a defendant in a lawsuit arising out of or related to the defendant's contacts with the forum state. *Helicoptores v. Hall*, 466 U.S. 408, 414 n. 8 (1984). Specific jurisdiction depends on the quality and nature of the defendant's contacts with the forum state in relation to the cause of action. *Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir. 1987). The Ninth Circuit has established a three-part test to determine whether a court may exercise specific personal jurisdiction over a nonresident defendant:

> (1) The nonresident defendant must do some act or consummate some transaction with the forum or perform some act by which he *purposefully avails* himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which *arises out of or relates to* the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be *reasonable*.

*Id*. (emphasis added.) *See also Ballard v. Savage*, 65 F.3d 1495 (9th Cir. 1995). The Ninth Circuit has also noted that these "contacts" requirements can be lessened if considerations of reasonableness so demand. *Haisten v. Grass Valley Med. Reimbursement Fund, Ltd.*, 784 F.2d 1392, 1397 (9th Cir. 1986).

The first requirement of "purposeful availment" or "purposeful direction" ensures that a defendant is not haled into court because of random, fortuitous or attenuated contacts or on account of the unilateral activity of third parties. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). Purposeful availment requires a finding that the defendant has performed some affirmative conduct, such as executing or performing a contract, which allows or promotes the

**Memorandum Decision and Order - Page 12**

transaction of business within the forum.  *Id*.; *Doe v. Unocal Corp.*, 248 F.3d 915, 924 (9th Cir. 2001).  However, an individual's contract with a nonresident defendant alone does not automatically establish sufficient minimum contacts for the purpose of asserting personal jurisdiction.  *Id*.  In *Doe*, the Ninth Circuit noted you must also evaluate prior negotiations, contemplated future consequences, terms of the contract and the parties' course of dealing.  *Id*.

Purposeful direction requires a finding that the defendant's actions outside the forum state are directed at the forum, such as the distribution in the forum state of goods originating elsewhere.  *Schwarzenegger v. Fred Martin Motor Corp.*, 374 F.3d 797, 803 (9th Cir. 2004).  In *Dole Food Co. v. Watts*, the Ninth Circuit applied the "effects" test for intentional torts.  303 F.3d 1104, 1111 (9th Cir. 2002).  This test requires that the defendant allegedly have: (1) committed an intentional act, (2) expressly aimed at the forum state, and (3) causing harm that the defendant knows is likely to be suffered in the forum state.  *Id*.

The second requirement for specific jurisdiction is that the contacts constituting purposeful availment be the ones that give rise to the lawsuit.  *Bancroft & Masters, Inc. v. Augusta Nat. Inc.*, 223 F.3d 1082, 1088 (9th Cir. 2000).  The Ninth Circuit measures this in terms of "but for" causation, that is, personal jurisdiction is proper only where "but for" the defendant's activities in the forum, the plaintiff's injuries would not have occurred.  *Id*.  This preserves the requirement that there be some nexus between the cause of action and the defendant's activities in the forum.

The third and final requirement is that the exercise of personal jurisdiction be reasonable and comport with the notions of fair play and substantial justice.  *Bancroft & Masters, Inc. v. Augusta Nat. Inc.*, 223 F.3d 1082, 1088 (9th Cir. 2000).  The burden is on the defendant to

**Memorandum Decision and Order - Page 13**

demonstrate unreasonableness. *Id*. The reasonableness determination requires a court to look at seven factors: (1) the extent of the defendant's purposeful interjection into the forum state, (2) the burden on the defendant in defending in the forum, (3) the extent of the conflict with the sovereignty of defendant's state, (4) the forum state's interest in adjudicating the dispute, (5) the most efficient judicial resolution of the controversy, (6) the importance of the forum to the plaintiff's interest in convenient and effective relief, and (7) the existence of an alternative forum. *Id*.

      The Court finds that the requirement of purposeful availment is not satisfied. The Court found in its June 20, 2007 decision that Duncan-Williams' underwriter status nor the presence of a document with its name on it were not enough to establish personal jurisdiction. The only new evidence before the Court is the alleged July 2003 telephone call. The Court has found that United Heritage did not prove by a preponderance of the evidence that Breunig and Crihfield participated in the alleged July 2003 telephone call. Duncan-Williams did not reach out to Idaho nor did it expressly aim any conduct towards Idaho. It was First Matrix who reached out to United Heritage in Idaho, provided them with the Preliminary Summary Sheet and sold them the bonds. A party cannot be haled into court due to the unilateral activity of another party.

      As to Duncan F. and Carolyn Williams, United Heritage contends that jurisdiction over them is reasonable as their "control person" status makes them subject to liability pursuant to the Tennessee Securities Act. In contrast, the defendants argue their alleged status as "control persons" does not establish personal jurisdiction. *See In re Rhodia, S.A., Secs. Litig.*, 513 F. Supp. 2d 527, 542-43 (S.D.N.Y. 2007) ("Being a corporation's control person of itself does not ...merit personal jurisdiction, nor does being a corporation's board member.")

**Memorandum Decision and Order - Page 14**

The Ninth Circuit has recognized that even if a parent corporation would be liable under a statute, the plaintiff cannot use liability as a substitute for personal jurisdiction. *AT&T v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 590-91 (9th Cir. 1996). In that CERCLA matter, the court found that "liability is not to be conflated with amenability to suit" even if meant that a parent corporation could avoid liability. *Id*. at 591.

That Duncan and Carolyn Williams may be liable under the TSA as "control persons," does not mean they are subject to personal jurisdiction in Idaho. There are no facts alleged in the Second Amended Complaint nor anything revealed at the evidentiary hearing that would lead the Court to find that Duncan and Carolyn Williams should be subject to personal jurisdiction in Idaho. They are not alleged to have participated in the July 2003 telephone call nor is it alleged that they had any involvement with the transaction at issue. The testimony at the hearing was unequivocal that they were not involved in this transaction.

## ORDER

Based on the foregoing, the Court being otherwise fully advised in the premises, **IT IS HEREBY ORDERED that:**

1)  Duncan-Williams' Motion to Dismiss (Docket No. 88), filed September 19, 2008, be **GRANTED**.



DATED: June 26, 2009

Honorable Mikel H. Williams
United States Magistrate Judge