IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

<table>
<tr><td></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>UNITED HERITAGE LIFE INSURANCE</td><td>)</td><td></td></tr>
<tr><td>COMPANY, <em>et al.</em>,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Plaintiffs,</td><td>)</td><td>Case No. CV 06-0496-S-MHW</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td><strong>MEMORANDUM DECISION</strong></td></tr>
<tr><td>FIRST MATRIX INVESTMENT</td><td>)</td><td><strong>AND ORDER</strong></td></tr>
<tr><td>SERVICES CORPORATION, a Texas</td><td>)</td><td></td></tr>
<tr><td>corporation; UNITED WESTERN</td><td>)</td><td></td></tr>
<tr><td>BANCORP, f/k/a Matrix Bancorp, Inc., a</td><td>)</td><td></td></tr>
<tr><td>Colorado corporation, BRIAN CURD,</td><td>)</td><td></td></tr>
<tr><td>individually; and KENT SNODGRASS,</td><td>)</td><td></td></tr>
<tr><td>individually,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Defendants.</td><td>)</td><td></td></tr>
<tr><td>_____</td><td>)</td><td></td></tr>
</table>

Currently pending before the Court are Defendants First Matrix Investment Services Corporation, United Western Bancorp, Brian Curd and Kent Snodgrass's (collectively, "First Matrix") Motion for Summary Judgment (Docket No. 94), filed September 30, 2008; Plaintiffs United Heritage Life Insurance Company and United Heritage Financial Group, Inc.'s (collectively, "United Heritage") Motion for Summary Judgment (Docket No. 136), filed May 20, 2009; and Defendants' Motion to Strike Plaintiffs' Statement of Undisputed Facts (Docket No. 147), filed July 24, 2009.

## I.
### Factual Background

Plaintiffs United Heritage Life Insurance Company and United Heritage Financial Group are Idaho companies with their principal place of business in Meridian, Idaho.

United Heritage Financial Group is the parent company and wholly owns United Heritage Life Insurance Company.[1]  Jack Winderl ("Winderl") is the Chief Investment Officer, Executive Vice President and Treasurer of United Heritage Life Insurance Company.  Winderl is also Executive Vice President and Treasurer of United Heritage Financial Group.  Winderl is a licensed CPA and holds various securities licenses.  In his position at Chief Investment Officer, which he has held since 1994, Winderl is in charge of investments.

Defendant First Matrix Investment Services Corporation  ("First Matrix") is a Texas corporation with its principal place of business in Denver, Colorado.  First Matrix is in the business of selling securities as a broker-dealer.  During July and August 2003, First Matrix maintained an office in Memphis, Tennessee.  Defendant United Western Bancorp is a Colorado corporation with its principal place of business in Denver, Colorado.  It is the parent corporation of First Matrix.  Defendant Brian Curd ("Curd") was formerly Chief Executive Officer of First Matrix.  Defendant Kent Snodgrass was formerly Managing Director, Retail Investments of First Matrix.

Joel Banes ("Banes") is a securities broker and was formerly employed by First Matrix in its Memphis office in 2003.  Prior to his employment with First Matrix, Banes was employed by Duncan-Williams.  First Matrix received the bonds in question from Duncan-Williams, the underwriter.  The relationship between First Matrix, Duncan-Williams and United Heritage is set forth in more detail in the Memorandum Decision and Order dated June 26, 2009 (Docket No. 143), dismissing Duncan-Williams from the lawsuit.

In July 2003, Banes sent United Heritage, through Winderl, an electronic solicitation

---

[1]  For the majority of the decision, the Court will refer to these entities as United Heritage, unless argument by the parties dictates otherwise.

which actively advertised investment in mortgage-based securities, specifically bonds, known as the Cameron Clarkesville Apartments Bonds ("Clarkesville Bonds" or "Bonds") which were stated to be governmentally guaranteed.  Prior to this time, Winderl had never conducted business with First Matrix or Banes.  At the time Banes contacted Winderl, United Heritage owned a large number of government-guaranteed securities.   Winderl requested additional information on the Bonds and United Heritage alleges that Banes orally represented that the investments were of a "mortgage backed" nature and that:  (1) the holder of the bonds would have the same status as a real estate mortgagor, with a concomitant direct right of real estate foreclosure that would help insure recovery of maturity value; and (2) the Bonds were protected by a 90% guarantee against principal loss issued through the United States Department of Agriculture.

On July 21, 2003, Banes faxed the Preliminary Summary Sheet to Winderl.  The Preliminary Summary Sheet describes the "Security Structure" of the Clarkesville Bonds as the mortgage, which was secured by the multi-family property (Cameron Clarkesville Apartments) and the mortgage note, which was 90% guaranteed by the United States Department of Agriculture (the "USDA guarantee") under the USDA's Section 538 Guaranteed Rural Rental Housing Program.

After receipt and review of the Preliminary Summary Sheet, Winderl held a telephonic conference with Banes to confirm the key securitization characteristics of the Bonds, and to conduct further inquiry regarding several details of the investment.  In the course of this telephone call, Winderl contends that it was expressly reiterated and confirmed directly to him that the Clarkesville Bonds were highly secured against principal loss due a 90% USDA

guarantee.[2]  Winderl view the maximum risk to this investment as being the remaining 10% that was not guaranteed by the USDA.

On or about July 30, 2003, United Heritage (specifically, United Heritage Life Insurance Company) orally agreed to buy a number of the Bonds.  On August 14, 2003, Banes sent Winderl a Certificate of Rule 144A Qualified Institutional Buyer for completion.  Winderl executed and returned the certificate to Banes that same day via fax.  The Clarkesville Bonds were settled on August 19, 2003 for a price of $1,789,794.38.

Other than the Preliminary Summary Sheet, United Heritage was not furnished, nor did it ask for, the Private Placement Memorandum or any other documentation relating to the Clarkesville Bonds.  United Heritage asserts that it was never informed that there were any other documents in existence at the time of the sale and was never given any hint the information in the Preliminary Summary Sheet was inaccurate or incomplete.

After purchasing the Clarkesville Bonds, United Heritage requested and received a copy of the Revised Preliminary Private Placement Memorandum ("PPM") from Banes.  The parties dispute whether the PPM contains information or implication which contradicts or modifies the representations made regarding the character of the Bonds' USDA 90% guarantee against loss.

On February 13, 2006, the Bank of New York, Trustee of the Clarkesville Bonds, issued a Notice of Default and Acceleration of Bond to the holders of the Bonds, including United Heritage.  United Heritage was told that the USDA had declined to extend any guarantee to the Bonds, owing to the fact that several of the precondition requirements for the project had not

---

[2]  Whether Duncan-Williams was a party to the telephone conversation was the subject of an earlier evidentiary hearing and order in which the Court found they did *not* participate in the telephone call.  United Heritage contends that whether Banes himself or Duncan-Williams made these representations for him, the result is the same.

been met, including: (1) failure to achieve minimum occupancy levels for a certain number of consecutive days; (2) failure of relevant loans to meet minimum debt service coverage ratio; and (3) failure to confirm that certain bills associated with the project were being paid.

From February 27, 2006 to May 8, 2006, United Heritage Life Insurance Company sold $1,273,500 par of the Clarkesville Bonds to United Heritage Financial Group in exchange for a payment of $1,283,685.97.  Following these transactions, United Heritage Life Insurance Company retained an interest in the Clarkesville Bonds in an amount of $425,000 par and United Heritage Financial Group held an interest in the Clarkesville Bonds worth $1,273,500.00 par.

On June 27, 2006, Plaintiffs sent a letter to First Matrix demanding that it repurchase the Clarkesville Bonds from Plaintiffs but First Matrix refused this request.  On August 31, 2006, United Heritage Life Insurance Company and United Heritage Financial Group sold its interest in the Clarkesville Bonds to Madison Investment Trust for the total sum of $843,978.02.

## II.
## Discussion

**A.    Motion for Summary Judgment Standard**

Motions for summary judgment are governed by Federal Rule of Civil Procedure 56. Rule 56, which provides in pertinent part, that judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c) (2007).

A moving party who does not bear the burden of proof at trial may show that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the non-moving party's case."  *Celotex Corp v. Catrett*, 477 U.S. 317, 325 (1986).  Once the

moving party meets the requirement of Rule 56 by either showing that no genuine issue of material fact remains or that there is an absence of evidence to support the non-moving party's case, the burden shifts to the party resisting the motion who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986).  It is not enough for the [non-moving] party to "rest on mere allegations or denials of his pleadings." *Id.*  Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.,* at 250.  "When determining if a genuine factual issue . . . exists, . . . a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability." *Id.,* at 254.  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

In determining whether a material fact exists, facts and inferences must be viewed most favorably to the non-moving party.  To deny the motion, the Court need only conclude that a result other than that proposed by the moving party is possible under the facts and applicable law.  *Aronsen v. Crown Zellerbach,* 662 F.2d 584, 591 (9th. Cir. 1981).

The Ninth Circuit has emphasized that summary judgment may not be avoided merely because there is some purported factual dispute, but only when there is a "genuine issue of material fact." *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 500 (9th Cir. 1992).  The Ninth Circuit has found that in order to resist a motion for summary judgment,

> the non-moving party:  (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-

moving party's claim implausible.

*British Motor Car Distrib. Ltd. v. San Francisco Automotive Indus. Welfare Fund,* 882 F.2d 371, 374 (9th Cir. 1989).

**B.      Securities Law Claim**

**1.      Is There a Conflict of Laws?**

First Matrix claims that whether the former Idaho Securities Act[3] or the Tennessee Securities Act applies in this case is a conflicts of law issue that must be resolved. They argue that the statutory laws of more than one state cannot apply to securities claims if the state where the court sits would recognize a conflict of laws between the competing securities laws.  *See In re Rospatch Sec. Litig.*, 1992 WL 226912 (W.D. Mich. July 8, 1992).  The conflict that exists, according to First Matrix, is that the Tennessee Securities Act allows Plaintiffs to bring a securities fraud action either within five years after the transaction or two years after the discovery of the facts constituting the violation, whichever is earlier, and the former Idaho Securities Act prohibits actions that are filed more than three years after the contract of sale. Tenn. Code Ann. § 48-2-122(h), Idaho Code § 30-1446(3) (repealed).  First Matrix argues that Idaho courts have recognized a conflict of law when two statutes have had conflicting statute of limitations and therefore a conflict of law exists.  *See Johnson v. Pischke*, 700 P.2d 19, 21-22 (Idaho 1985).

United Heritage counters that a plaintiff in a securities fraud action may pursue alternative remedies through the application of various states' securities laws which have some

---

[3]  Because the transaction occurred in 2003, the former Idaho Securities Act would apply.  The current Idaho Uniform Securities Act at I.C. 30-14-703 dictates that the predecessor act applies to all actions on the basis of conduct occurring before the effective date of the Act (September 1, 2004).

territorial nexus with the transaction at issue.  *See Lintz v. Carey Manor Ltd.*, 613 F. Supp. 543

(W.D. Va. 1985).  The *Lintz* case states that so long as there are not multiple recoveries, there is

nothing inconsistent with trying a securities case on multiple theories.  *Id*. at 551.  United

Heritages claims that many jurisdictions and secondary authorities have found that as long as

there is a territorial nexus to the securities transaction, plaintiffs may elect their remedies.  *See,*

*e.g.*, *Simms Investment Co. v. E.F. Hutton & Co., Inc.*, 699 F. Supp. 543 (M.D.N.C. 1988);

*Garland v. Advanced Medical Fund, L.P.*, 86 F. Supp. 2d 1195 (N.D. Ga. 2000).  *See also*

McClard, The Applicability of Local Securities Acts to Multi-State Securities Transactions, 20

U.Rich.L.Rev. 139 (1985).

  The Court finds United Heritage's argument to be more persuasive.  The developing

majority view is that so long as there is a territorial nexus, more than one states' securities laws

can apply to a transaction, so long as that statute does not limit its own application.  Securities

transactions are unique and a traditional conflict of laws analysis is not a good fit.   The

following reasoning in the *Simms* case is instructive on how courts should approach these

situations without resorting to conflicts of law:

> Overlapping state securities laws do not present a classic conflict
> of laws question.  Blue Sky laws protect two distinct public
> policies.  First the laws protect resident purchasers of securities,
> without regard to the origin of the security.  Second, the laws
> protect legitimate resident insurers by exposing illegitimate
> resident insurers to liability, without regard to the markets of the
> insurer. . . An example may illustrate the foregoing analysis.
> Suppose a North Carolina resident brought an action against a
> defendant alleging fraud under state securities laws. The "offer to
> sell" the security was "made" in North Carolina and the security
> was bought in Colorado. Because jurisdictional requirements have
> been satisfied, the securities laws of both Colorado and North
> Carolina would apply. North Carolina is interested in protecting its

> defrauded citizen and Colorado is interested in eliminating a base
> of fraudulent operations located within its borders. Each state's
> interest is vindicated by permitting the plaintiff to pursue multiple
> theories, as long as he is limited to a single recovery based upon a
> finding of liability.

*Simms Investment Co. v. E.F. Hutton & Co. Inc.*, 699 F. Supp. 543, 545-46 (M.D.N.C. 1988).

Moreover, the Idaho Supreme Court recently found, seemingly in contrast to the holding of *Johnson v. Pischke*, that when competing causes of action are created by statute, and not founded in tort or contract, the issue is not one of a choice of law. *See Houston v. Whittier*, __ P.3d __, 2009 WL 2579579, *6 (Idaho Aug. 21, 2009). *Houston* is in accord with the line of jurisprudence cited above finding that which jurisdiction's securities laws should apply is not a choice of law issue.

So long as there is a territorial nexus between Tennessee and Idaho and the transaction at issue, both statutes may apply.[4]  The Court will determine whether Tennessee had such a territorial nexus to the transaction in the next section.

### 2.      Territorial Nexus

In order for a sufficient territorial nexus to exist in Tennessee, the transaction must fall within the scope of the Tennessee Securities Act. *See Simms Investment Co.*, 699 F. Supp.2d at 546.  The three jurisdictional requirements for invoking the Tennessee Securities Act are there must be an "offer" or "sale," it must involve a "security" and the transaction must occur within the state.  The first two requirements have been met, the transaction involved a sale of a security.

---

[4]  Both sides and the Court agree that this cause of action would be barred by the former Idaho Securities Act which required that a cause of action be filed within three years after the contract of sale. I.C. § 30-1446(3) (repealed).  Because the contract of sale occurred in August 2003 and the lawsuit was not filed until October 27, 2006, the claim would be barred.  While it is clear that Idaho had a sufficient territorial nexus to the transaction, it is not necessary to discuss Idaho's nexus since any claim under Idaho law would be barred by the three year statute of limitations.

The third requirement has been satisfied as well.  First Matrix made the offer to sale the security from its office in Tennessee, it sent materials and made telephone calls from Tennessee.  United Heritage transferred funds to First Matrix in Tennessee to purchase the Bonds.  The Court finds a sufficient territorial nexus between this transaction and Tennessee exists.

      **3.**        **Tennessee Securities Act and Statute of Limitations**

Previously, this Court held that the former Idaho Securities Act would not apply to Plaintiffs' claim under the Colorado Securities Act.  *Memorandum Decision and Order* (Docket No. 43), pp. 21-22.   Now, First Matrix argues that the statute of limitation found in I.C. § 5-218(1) should apply to United Heritage's claim under the Tennessee Securities Act and under such statute of limitations, the claim would be barred.  United Heritage contends that its claim is not untimely under the Tennessee Securities Act or any other Idaho statute of limitations that may apply, such as I.C. § 5-218(4) or I.C. § 5-224.

In line with what was previously held by this Court, the Tennessee Securities Act statute of limitations will apply to that claim.  There is little support, if any, for the arguments propounded by First Matrix and in the alternative by United Heritage, that these other Idaho statute of limitations should apply to the Tennessee Securities Act claim.

The statute of limitations set forth in the Tennessee Securities, Tenn. Code Ann. § 48-2-122(h), states: "No action shall be maintained under this section unless commenced before the expiration of five (5) years after the act or transaction constituting the violation or the expiration of two (2) years after the discovery of the facts constituting the violation, or after such discovery should have been made by the exercise of reasonable diligence, whichever first expires."  The question becomes whether United Heritage, having filed their action on October 27, 2006, could

have discovered the facts constituting the alleged fraud before October 27, 2004.  *See Haney v. Dean Witter Reynolds, Inc.*, 1986 WL 21340, *3 (E.D. Tenn Aug. 20, 1986).  First Matrix maintains that United Heritage should have discovered the alleged misrepresentations or omissions no later than September 2003 when they received the Revised Preliminary Private Placement Memorandum (PPM).  In contrast, United Heritage argues that the PPM would *not* have put them on notice about the true nature of the guarantee and foreclosure rights, and therefore would not have put them on notice of the alleged misrepresentations.  Moreover, United Heritage contends that this determination of whether they knew, or should have known, a cause of action existed is a question of fact.  *See City State Bank v. Dean Witter Reynolds*, *Inc.*, 948 S.W.2d 729, 735 (Tenn. App. 1997) (". . . there is ample authority for the proposition that whether a plaintiff discovered, or in the exercise of reasonable diligence, should have discovered an injury resulting from defendant's act creates a genuine issue of fact, precluding disposition by summary judgment.")

Both parties submit opposing evidence on this issue.  First Matrix cites to various statements in the PPM and argues they directly contradict any previous representations made regarding the right of foreclosure and USDA guarantee.  In contrast, United Heritage asserts that it is not industry practice to review a private placement memorandum because of their length and the quick manner in which decision to purchase securities have to be made.  Further, United Heritage argues that when the PPM is viewed in context and in its entirety, nothing in it should have put United Heritage on notice about the true nature of the guarantee and foreclosure right.

The Court agrees with United Heritage that whether the PPM should have put them on notice when they received it in September 2003 is a question of fact that precludes summary

**Memorandum Decision and Order - Page 11**

judgment.  Similar to the *City State Bank* case, it cannot be found as a matter of law whether the

PPM presented a "glaringly obvious red flag" that should have put United Heritage on notice of

the true nature of the guarantee and foreclosure right.  948 S.W. 2d 729, 737.   It is up to the fact-

finder to determine whether there were inconsistencies between what was orally represented,

what is expressly stated in the Preliminary Summary Sheet, what is contained in the Revised

Preliminary Private Placement Memorandum and whether any inconsistencies should have put

United Heritage on notice of a possible cause of action.

**C.      Fraud - Statute of Limitations**

First Matrix contends that United Heritage's fraud claim is untimely.  The statute of

limitations for fraud in Idaho is three years and states the claim does not accrue "until the

discovery, by the aggrieved party, of the facts constituting the fraud or mistake."  I.C. § 5-

218(4).  "Actual knowledge of fraud can be inferred if the aggrieved party could have discovered

the fraud by reasonable diligence, although the court will hesitate to infer such knowledge."

*Necro Minerals Co. v. Morrison Knudsen Corp.*, 90 P.3d 894, 900 (Idaho 2004).  It is maintained

by First Matrix that there is "no question" that United Heritage could have discovered the

alleged misrepresentations or omissions in September 2003 by reviewing the PPM but failed to

review the offering document and did not exercise due diligence.

United Heritage maintains that the discovery rule "requires more than an awareness that

something might be wrong; it requires knowledge of the facts constituting fraud."  *McCoy v.*

*Lyons*, 820 P.2d 360, 368 (Idaho 1991).  Additionally, recent Idaho cases have held "the courts

of this states should hesitate to infer knowledge of fraud."  *Id*; *see also Umphrey v. Sprinkel*, 682

P.2d 1247, 1253-54 (Idaho 1983) (noting the legislature's clear intent was to afford victims of

**Memorandum Decision and Order - Page 12**

fraud more time in which to discover the machinations which led to their exploitation).

In accordance with the Court's finding in regard to the Tennessee Securities Act and its statute of limitations, the Court holds that whether United Heritage knew or should have known of the facts constituting fraud before 2006 is a question of fact that will preclude summary judgment at this time.

**D.      Idaho Consumer Protection Act Claim**

The Idaho Consumer Protection Act (ICPA) is codified at I.C. § 48-601, *et seq*.  Section 48-601 provides that the purpose of the act is "to protect both consumers and businesses against unfair methods of competition and unfair or deceptive acts and practices in the conduct of trade or commerce. . ."  Section 48-603 states a violation of the ICPA will occur where a person knows, or in the exercise of due care should know, that he has in the past, or is now engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.[5]  The ICPA then goes on to list nineteen specific acts that constitute these unfair methods or deceptive acts or conduct.  First Matrix argues that transactions involving the purchase and sale of securities are already heavily regulated by state and federal laws and administrative agencies which enforce those laws through complex regulatory schemes and there is no need to look to the ICPA for relief in this area.

There is no Idaho jurisprudence addressing whether the ICPA applies to securities transactions.  The statutes do provide that the intent of the legislature in construing this act is that

---

[5] "Trade and commerce" are defined as the "advertising, offering for sale, selling, leasing, renting, collecting debts arising out of the sale or lease of goods or services or distributing goods or services. . ."  "Goods" is defined as "any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, including certificates or coupons exchangeable for goods."  "Services" is defined as "work, labor or any other act or practice provided or performed by a seller to or on behalf of a consumer."  I.C. § 48-602.

"due consideration and great weight shall be given to the interpretation of the federal trade commission and the federal courts relating to section 5(a)(1) of the federal trade commission act (15 U.S.C. 45(a)(1))," which is part of the Federal Trade Commission Act (FTCA) that addresses unfair methods of competition and unfair or deceptive acts or practices.  I.C. § 48-604(1).  The statutes also provide that the act is remedial in nature and should be so construed.  I.C. § 48-601. Lastly, the statutes state that the act "is to be construed uniformly with federal law and regulations."  I.C. § 48-618.

First Matrix relies on these instructions from the Idaho legislature in citing to cases from other jurisdictions whose consumer protection statutes contained similar commands to construe the statute in accordance with federal law.  For example, in *Spinner Corp. v. Princeville Devel. Corp.*, the Ninth Circuit, in interpreting Hawaii's "baby FTC Act," found that because the Hawaii statute required that it be "construed in accordance with the judicial interpretation of similar federal antitrust statutes" and § 5(a)(1) of the FTCA had not been applied in the securities context since 1923, Hawaii's statute would not apply to claims arising from securities transactions.  849 F.2d 388, 390-393 (9th Cir. 1988).  The Ninth Circuit held:

> We conclude that the Hawaii Supreme Court, if confronted with questions whether Hawaii's baby FTC act applies to claims arising from securities transactions, would hold that it does not.  We are persuaded by the structure of the statute, the legislative command to refer to federal FTCA jurisprudence, the existence of Hawaii statutes that cover securities transactions, and the trend of the relatively few applicable judicial decisions.

*Id.* at 393.

First Matrix also cites to cases from Washington and Rhode Island that have held similarly.[6]  Because the ICPA is similar to Hawaii's baby FTC Act, First Matrix argues the rationale of *Spinner* should apply.  United Heritage, on the other hand, cites to other jurisdictions, such as Illinois, New York, Kansas and Pennsylvania,[7] that have found their respective consumer protection statutes do apply to securities transactions.  United Heritage specifically relies on the reasoning from *Denison v. Kelly*.  759 F. Supp. 199 (M.D. Pa. 1991).  In that case, the court found that the consumer protection statute "plainly and unambiguously cover[ed] the alleged conducts of the defendants in connection with the security transactions at issue."  *Id*. at 203.  It also held that there was no "irreconcilable conflict" between the state's consumer protection act and its securities act and accordingly both must be enforced.  *Id*. at 204.  It was also noted that the "remedial nature of the statute," the exemption provision failing to exempt brokerages or stock brokers, and the saving provision in the state securities act explicitly preserving "any other statutory" remedy all played into the court's finding.  *Id*. at 205.

United Heritage argues that Idaho case law also supports a broad reading of the ICPA.  For this proposition, Plaintiff relies on *In re Wiggins*.  273 B.R. 839 (Bankr. D. Idaho 2001).  In that case, the plaintiff brought claims under the ICPA against the defendant who specialized in purchasing structured personal injury and other settlement streams for cash at what it considered their discounted present value.  *Id*. at 847.  The court took the view that Defendant was "in effect engaged in 'selling money'" and a "modern day moneychanger. . .[i]t traded cash for contract

---

[6]  *See Kittilson v. Ford*, 595 P.2d 944 (Wash. 1979); *State v. Piedmont Funding Corp.*, 382 A.2d 819 (R.I. 1978).

[7]  *See Wafra Leasing Corp. 1999-A-1 v. Prime Capital Corp.*, 204 F. Supp. 2d 1120 (N.D. Ill. 2002); *Scalp & Blad v. Advest, Inc.*, 281 A.D.2d 882 (N.Y.A.D. 2001); *Jackson v. John Hancock Fin. Servs., Inc.*, 2006 WL 2710327 (D. Kan. 2006); *Denison v. Kelly*, 759 F. Supp. 199 (M.D. Pa. 1991).

rights, and in the process, offered its 'clients' financial advice (i.e., a 'service') in achieving their particular financial goals." *Id*. at 856.  United Heritage maintains that in following the reasoning from *Wiggins*, the ICPA is applicable because First Matrix offered "goods" in the form of bonds and "services" in the form of selling a financial profit vehicle.  *See also White v. Mock*, 104 P.3d 356 (Idaho 2004) (interpreting the plain language of the ICPA to apply to individuals not engaged in the business of selling real property).

By looking at the words of the statute itself and giving them their plain meaning, United Heritage argues it is clear that securities transactions are within the purview of the ICPA.  United Heritage also argues that by omitting securities transactions from the list of exceptions contained in the ICPA,[8] it is presumed the Idaho Legislature intended that plaintiffs filing claims involving the deceptive sale of securities be afforded protection under the ICPA.  United Heritage lastly argues that there is no conflict between the ICPA and federal and state securities laws and the ICPA can, and should be, applied to the claims in this case.

First Matrix maintains that the Idaho cases cited by Plaintiffs, *Wiggins* and *White v. Mock*, do not address arguments that the Ninth Circuit and other courts have found outcome determinative when deciding whether a consumer protection act applies to securities transactions.  Additionally, First Matrix argues that the cases cited from other jurisdictions are distinguishable from this case because their statutes did not contain a legislative directive to look at the FTCA and federal courts' interpretations of § 5(a)(1) of the FTCA.

---

[8]   I.C. § 48-605 contains exceptions for application of the ICPA to: "(1) Actions or transactions permitted under laws administered by the state public utility commission or other regulatory body or officer acting under statutory authority" of Idaho or the United States; "(2) Acts done by publishers, broadcasters, printers, retailers, or their employees . . .without knowledge or reason to know of the misleading or deceptive character of such advertisement . . .;" "(3) Persons subject to chapter 13, title 41, Idaho Code, defining and providing for the determination . . .of unfair methods of competition or unfair or deceptive acts or practices in the business of insurance."

**Memorandum Decision and Order - Page 16**

The Court finds the holding of the Ninth Circuit in *Spinner Corp. v. Princeville Devel. Corp.* to be persuasive.  The Idaho Consumer Protection Act is very similar to the Federal Trade Commission Act as well as Hawaii's "baby FTC Act" and accordingly should not apply to securities transactions.  Jurisdictions that contain a directive to look at the FTCA and its interpretation have held that their consumer protection acts do not cover securities transactions. *See Kittilson v. Ford*, 595 P.2d 944, 947-48 (Wash. 1979); *State v. Piedmont Funding Corp.*, 382 A.2d 819 (R.I. 1978).  Jurisdictions which have deviated from *Spinner*'s holding have done so because the statute at issue did *not* contain a similar directive.  *See, e.g., Overstock.com, Inc. v. Gradient Analytics, Inc.*, 61 Cal. Rptr. 3d 29, 51 (Cal. Ct. App. 2007) (noting that unlike the Hawaii statute at issue in *Spinner*, the California consumer protection statute contained no directive to interpret it consistently with the FTCA.)

Additionally, Idaho has adopted the Uniform Securities Acts which would cover the type of claim United Heritage attempts to bring under the ICPA and would provide appropriate relief. The cases cited by United Heritage to prove the contrary are unconvincing and the Court finds that the Idaho Legislature did not intend for securities transactions to be within the purview of the ICPA.

**E.     Reasonable Reliance - Securities and Fraud Claims**

First Matrix argues that United Heritage's reliance on the representations was unreasonable as a matter of law while United Heritage contends their reliance was reasonable because it was a substantial factor in determining their course of conduct.  The Fourth Circuit has set forth eight factors for determining whether an investor is justified in relying on a material omission.  First Matrix claims seven of these eight factors weigh against United Heritage's

reasonable reliance whereas United Heritage contends these factors actually work in their favor. These factors include: (1) the sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of long standing business or personal relationships; (3) access to relevant information; (4) the existence of a fiduciary relationship; (5) concealment of fraud; (6) opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentation. *Banca Cremi, S.A. v. Alex Brown & Sons, Inc.*, 132 F.3d 1017, 1027-28 (4th Cir. 1997).

In looking at these factors, the Court finds that whether United Heritage's reliance was reasonable is a question of fact that prevents summary judgment to both parties on these claims. This is not a case where the undisputed facts leave no room for a reasonable difference of opinion as to whether United Heritage's reliance was reasonable. There are many factors to consider and those factors do not clearly favor one party over the other. This determination will be left for the trier of fact.

First Matrix also asks the Court to find, as a matter of law, that the alleged misrepresentations and omissions are not actionable because they were statements of opinion. The Court will not do so. The determination of whether these statements or omissions were material to United Heritage in purchasing Bonds will be decided by the trier of fact.

## F.     Standing of United Heritage Financial Group

First Matrix argues that United Heritage Financial Group does not have standing to bring claims against them. As noted earlier, United Heritage Financial Group is the sole shareholder and parent corporation of United Heritage Life Insurance Company. As it was

United Heritage Life Insurance Company that purchased the Bonds from First Matrix, and not United Heritage Financial Group, only it should be entitled to bring these claims.  As noted earlier, once the Bonds went into default, United Heritage Life Insurance Company sold portions of them to United Heritage Financial Group and retained an interest in the amount of $425,000 par.

First Matrix contends that United Heritage Financial Group has no standing under the Tennessee Securities Act because it did not purchase the Bonds from First Matrix.  Under § 48-2-122(a)(1)(B), "[a]ny person who . . .[s]ells a security in violation of § 48-1-121(a) . . .shall be liable to the person purchasing the security from the seller. . ."  Next, for common law fraud, First Matrix argues that because United Heritage Financial Group was not the "hearer" of the alleged misrepresentations, it cannot prove fraud.  *See Beco Construction, Co. v. Bannock Paving Co.*, 797 P.2d 863, 868 (Idaho 1990) (finding that plaintiff did not prove all the elements of fraud because the representations were made to third parties and not to plaintiff, and accordingly, the plaintiff was not the "hearer" of the misrepresentation).  Because United Heritage Financial Group purchased the bonds after they were in default, it cannot claim to have relied on First Matrix and was not directly damaged by First Matrix.  First Matrix argues that United Heritage Life Insurance Company's damages should be limited to its loss on $425,000 par in the Clarkesville Bonds.

In response, Plaintiffs contends that United Heritage Life Insurance Company and United Heritage Financial Group are a unitary group of companies formed to provide insurance services, with United Heritage Financial Group and United Heritage Life Insurance Company operating as two divisions or departments of the same overall enterprise.  United Heritage Financial Group is

the parent/holding company of all other United Heritage operating entities and United Heritage

Life Insurance Company is a wholly owned and controlled subsidiary.  United Heritage contends

the transfer of the Bonds between United Heritage Life Insurance Company and United Heritage

Financial Group was an internal bookkeeping act only, done strictly for accounting purposes.

United Heritage Financial Group does not have standing on its own to bring claims

against First Matrix; it was not the "purchaser" of securities from First Matrix for purposes of the

Tennessee Securities Act nor was it the receiver of the alleged misrepresentations for purposes of

a common law fraud claim.

Every corporation is to be regarded as a separate legal entity.  *Jolley v. Idaho Securities,*

*Inc*., 414 P.2d 879 (Idaho 1966).  The powers of a court to disregard a corporate entity must be

exercised cautiously.  *Id*.  The Eastern District of New York has recognized that "a corporation

does not have standing to assert claims belonging to a related corporation, simply because their

business is intertwined."  *Diesel Systems, Ltd. v. Yip Shing Diesel Engineering Co., Ltd.*, 861 F.

Supp. 179, 181 (E.D.N.Y. 1994).   Morever, that court found that the corporations must be bound

by the disadvantages as well as the advantages of separate incorporation.  *Id*.

The Court agrees with this reasoning.  When a corporation sets up subsidiaries in order to

derive benefits from their separate incorporation, they are also bound to the disadvantages of this

separate incorporation.   Once the Bonds were in default, United Heritage Life Insurance

Company, being regulated by the Idaho Department of Insurance, presumably wanted to get the

bad investment off their books by transferring them to United Heritage Financial Group.  Mr.

Winderl's reasons for doing so are clearly set forth in his report to the investment board:

> When I received a call from another broker informing me of
> potential workout issues with the project, I decided to have [United

> Heritage Financial Group] purchase a portion of the [United
> Heritage Life Insurance Company] investment in Clarkesville
> because of rating concerns and the ability of [United Heritage
> Financial Group] to take a long term view of the workout,
> including potentially owning a proportional interest in the
> apartments.

Affidavit of W. Christopher Pooser, Exhibit K (Docket No. 94-16). By doing so, United

Heritage Life Insurance Company obtained the benefit of having this investment off their books.

It enjoyed the benefits of separate incorporation and now must accept the detriments.

Under the Tennessee Securities Act, damages are limited to the "amount that would be

recoverable upon a tender, less the value of the security when the purchaser disposed of it and

interest at the legal rate at date of disposition." Tenn. Code Ann. § 48-1-122(a)(1)(b). United

Heritage Life Insurance Company tendered the bonds back to First Matrix on June 27, 2006,

when it owned a $425,000 position in the Bonds. United Heritage Life Insurance Company

cannot now bootstrap its losses on to those allegedly suffered by another incorporated entity,

United Heritage Financial Group.

**G.     Control Persons**

Under the Tennessee Securities Act, a person who directly or indirectly controls a person

liable for securities fraud are jointly and severally liable for the violation. Control is defined as

"the possession, directly or indirectly, of the power to direct or compel the direction of the

management or policies of a person, whether through ownership of voting securities, by contract,

or otherwise." Tenn. Code Ann. 48-1-102(7). A federal district court in Tennessee has

interpreted this statute and found that to state a claim for control person liability, the plaintiff

must show: (1) a primary securities law violation; (2) power to control the specific transaction or

activity upon which the primary violation is predicated; and (3) actual participation in the operations of the primary violator in general.  *Cannon v. GunnAllen Financial, Inc.*, 2007 WL 2351313, *4 (M.D. Tenn. Aug. 14, 2007).  *See also As You Sow v. AIG Financial*, 584 F. Supp. 2d 1034, 1045 (M.D. Tenn. 2008) (concluding that "controlling person" includes a securities dealer that "indirectly" controls its registered agent).

The Court agrees with First Matrix that United Heritage has submitted not even a scintilla of evidence to create a question of fact on the issue of whether Brian Curd and Kent Snodgrass were control persons under the Tennessee Securities Act.  The Court agrees with the reasoning from *Cannon v. GunnAllen Financial*, in which the court noted the similarities between the Tennessee Securities Act and the Securities and Exchange Act and interpreted them in the same manner, concluding the three factors set forth above must be found.  This Court sees no evidence that Curd and Snodgrass had the power to control this transaction or actually participated in First Matrix's operations.

**H.    Motion to Strike**

First Matrix moves to strike Plaintiffs' Statement of Undisputed Facts (Docket No. 107-2), arguing that this document is not actually a statement of facts but rather a narrative that includes additional argument, commentary, editorials and paraphrases deposition testimony. The Court will not strike Plaintiffs' statement of facts in its entirety but will disregard portions of the document that are arguments or conclusory statements, rather than facts.

## ORDER

Based on the foregoing, the Court being otherwise fully advised in the premises, **IT IS HEREBY ORDERED that:**

1)       Defendants First Matrix Investment Services Corporation, United Western Bancorp, Brian Curd and Kent Snodgrass's Motion for Summary Judgment (Docket No. 94), filed September 30, 2008, be **GRANTED IN PART and DENIED IN PART**;

2)       Plaintiffs United Heritage Life Insurance Company and United Heritage Financial Group, Inc.'s Motion for Summary Judgment (Docket No. 136), filed May 20, 2009, be **DENIED**;

3)       Defendants' Motion to Strike Plaintiffs' Statement of Undisputed Facts (Docket No. 147), filed July 24, 2009, be **GRANTED IN PART and DENIED IN PART**.

DATED: September 30, 2009

_____
Honorable Mikel H. Williams
United States Magistrate Judge